Brian AURINGER, petitioner, Appellant,

v.

STATE of Minnesota, Respondent.

No. A04–950.

Court of Appeals of Minnesota.

May 10, 2005.

John M. Stuart, State Public Defender, Benjamin J. Butler, Assistant Public Defender, Minneapolis, MN, for appellant.

Mike Hatch, Attorney General, Thomas R. Ragatz, Assistant Attorney General, St. Paul, MN, and Michael K. Riley, Nicollet County Attorney, Michelle M. Zehnder Fischer, St. Peter, MN, for respondent.

Considered and decided by
KLAPHAKE, Presiding Judge;
TOUSSAINT, Chief Judge; and
PETERSON, Judge.

## OPINION

TOUSSAINT, Chief Judge.

In this appeal from an order denying a postconviction petition challenging appellant's convictions for first- and second-degree criminal sexual conduct, appellant argues that the statutory definition of sexual penetration does not include digital penetration of the victim's vagina through her clothing. Appellant also argues that the trial court committed plain error at trial in admitting an audiotape of appellant's statement to police, during which the officer allegedly vouched for the credibility of the victim's report. Because we conclude the term "sexual penetration" unambiguously includes penetration through clothing and the trial court did not err in admitting the audiotape, we affirm.

## FACTS

Thirty-eight-year-old appellant Brian Jay Auringer provided after-school care for Tammy and Paul Burandt's six-year-old twins and Tammy's 12–year–old daughter from a previous marriage, P.S. On May 16, 2001, Mrs. Burandt took P.S. to a clinic for a camp physical exam. Nurse Practitioner Nancy McLoone conducted the exam. P.S. told McLoone that she was having trouble sleeping because she "thinks a lot about things and worries," and Auringer was hurting her. McLoone also noted that P.S. seemed sad and was tearful when talking about Auringer and opined that P.S. exhibited common characteristics of an abused child.

Mrs. Burandt was present during the exam. When P.S. said Auringer had hurt her, Mrs. Burandt asked P.S. if she was telling the truth this time because P.S. had previously made similar allegations against her father and stepfather. P.S. tearfully told her mother it was true. P.S. told McLoone that Auringer had hurt her the previous day, May 15, and many other times. She also explained that she had not told anyone because Auringer said he would hang her if she did. McLoone reported the alleged abuse to social services.

Detective Curt Tuma was in charge of the investigation. He referred P.S. for a "Corner House" interview with Brenda Dittrich of Nicollet County Child Protection. Dittrich's May 18 interview with P.S. was videotaped and played to the jury. Using dolls, P.S. described Auringer inserting his fingers into her vagina. She also described incidents of him touching her privates on the couch, on the stairs, in the bathroom, and the bedroom, and him placing her hand on his penis in the bedroom.

Detective Tuma asked Auringer to talk to him about P.S.'s allegations. Auringer agreed to appear for an interview on May 24. The interview was audiotaped and played to the jury without objection. Auringer explained to the detective that the Burandts had told him to be careful because P.S. had previously made allegations against Mr. Burandt. Auringer told the detective he thought P.S. was "probably pulling the same stunt like she did ... to Paul." The detective clarified that P.S. had not claimed that Auringer had "raped"

her, but she had claimed that he had "done some things to her." The detective said he wanted Auringer to tell him the truth because P.S. "tells a pretty convincing story and I wanna be able to speak to your truthfulness at our County Attorney's Office." He told Auringer that he had to convince the county attorney that what P.S. alleged did not happen. After Auringer denied putting his hand between P.S.'s legs, the detective said: "that's what she's telling me and she's pretty convincing about it. Now ... if you did it, I want to hear it now, cause ... it's gonna go kinda tough for you if ... you're lying to me." Tuma also asked Auringer why he thought P.S. would say these things, and Auringer explained that she might have been mad at him for taking some makeup away from her. Again, trying to elicit more information from Auringer, Tuma said "I gotta ... talk to the County Attorney about something and with what we got here, Brian, you know what I'm sayin'? She tells a pretty good story. You follow-in' me?" Then, Tuma gave Auringer a chance to blame P.S., saying, "Did she kinda coerce you into something or—or convince you to do something here—touch her or whatever?" Again, Tuma clarified that he had to tell the County Attorney something and he'd rather say Auringer told him the truth than "you know, you have to believe what the kid said." When Auringer began admitting that some touching could have happened, Tuma again stated that the county attorney would decide who was telling the truth, so Auringer should tell him the truth. Auringer eventually admitted that P.S. touched his penis in the bedroom.

At trial, P.S. testified that Auringer had threatened to shoot or hang her if she reported the conduct. She also testified to Auringer touching her breasts over her clothing in the bathroom; unzipping his pants and placing her hand on his penis in a bedroom; touching and inserting his fingers into her vagina through her clothing in the bedroom; touching and inserting his fingers into her vagina while they were on the couch; and touching and rubbing her vagina and buttocks while she was on the stairs.

The jury found Auringer guilty on two counts of first-degree and two counts of second-degree criminal sexual conduct. He was convicted of and sentenced for two counts of first-degree criminal sexual conduct under Minn.Stat. § 609.342, subds. 1(a), 2 (2000). Auringer now challenges his convictions on appeal from an order denying his petition for postconviction relief.

## ISSUES

I. Does the first-degree criminal sexual conduct offense include digital penetration of the vagina through the victim's clothing?

II. Did the audiotape of the investigating officer's conversation with Auringer include impermissible vouching testimony, and, if so, did its admission constitute reversible plain error?

III. Should Auringer's pro se brief be disregarded?

## ANALYSIS

### I.

■ Auringer argues that "inserting his finger into P.S. through her clothing" does not fall within the statutory definition of "sexual penetration" for first-degree criminal sexual conduct.

■ The standard of review for statutory interpretation is de novo. *State v. Iverson*, 664 N.W.2d 346, 350 (Minn.2003). A reviewing court's goal in statutory interpretation is "to give effect to the intention

of the legislature in drafting the statute." *State v. Orsello*, 554 N.W.2d 70, 74 (Minn. 1996). We rely on the plain meaning of the statute unless it is ambiguous. *Iverson*, 664 N.W.2d at 351.

The legal question raised by Auringer appears to be one of first impression in the Minnesota courts. The same question was raised under analogous federal law in *United States v. Norman T.*, 129 F.3d 1099 (10th Cir.1997). There, the court interpreted the federal statute defining "sexual act" as "penetration, however slight, of the anal or genital opening of another" and concluded "penetration" includes penetration taking place through clothing. *Id.* at 1102–03.

Auringer was convicted under Minn. Stat. § 609.342, subd. 1(a) (2000), which states that it is a crime for a person to "engage[ ] in sexual penetration with another person ... if ... the complainant is under 13 years of age and the actor is more than 36 months older than the complainant." "Sexual penetration" is, in relevant part, "any intrusion however slight" into the genitals of the complainant's body. Minn.Stat. § 609.341, subd. 12(2) (2000).

Auringer's admission on appeal that he "inserted" his finger into P.S.'s vagina would appear to unambiguously fall within the definition of sexual penetration. Auringer attempts to create an ambiguity, however, by contrasting the definition of "sexual penetration" with the definition of "sexual contact," which is the basis for other criminal sexual conduct offenses. *See* Minn.Stat. §§ 609.342–3451 (2000). He makes no attempt to identify an ambiguity within the language of the first-degree criminal sexual conduct statute, in particular the definition of penetration. Instead, his argument relies solely on his comparison of the statutory definitions of penetration and contact.

Auringer argues that the legislature did not intend to include penetration through clothing as "penetration" because it did not expressly refer to clothing in the definition of sexual penetration. In contrast, Auringer points to the definition of sexual contact, which may occur either by touching bare skin or by touching through clothing. *See* Minn.Stat. § 609.341, subd. 11(a)–(c) (2000) (setting out several types of "sexual contact").

A review of the criminal sexual conduct statutes demonstrates the legislature's ability to precisely describe prohibited acts and prescribe appropriate penalties for each. Not only does the legislature provide detailed definitions of the applicable terms, including penetration and contact, Minn.Stat. § 609.341 (2000), but it describes five degrees of prohibited conduct specifically using those terms, Minn.Stat. §§ 609.342–.3451. The legislature also considered a number of factors in attaching a penalty to each criminal act: the age and mental competence of the complainant and the actor, consent, coercion, the specific conduct, and the relationship between complainant and actor. *See id.* Given the legislature's attention to the details of these offenses, there is no merit in Auringer's argument that the legislature actually intended to include other distinguishing elements in a definition whose meaning otherwise is plain. *See generally State v. Koperski*, 611 N.W.2d 569, 573 (Minn.App. 2000) (holding this court may not supply what legislature has omitted).

Furthermore, there is no rule of statutory construction that requires symmetry between the statutory definitions of penetration and contact. The definitions of each are set out distinctly and with precision. And the operative word in the definition of penetration is "intrusion." Minn. Stat. § 609.341, subd. 12(2). "Intrusion" is absent from all forms of touching de-

scribed in the statutes. This, alone, is an adequate distinction between the two terms that removes any question of ambiguity. We see nothing irreconcilable in these unambiguous definitions.

If the presence of clothing were a relevant factor justifying distinct treatment in cases of penetration, there is no question that the legislature would have so stated. Accordingly, applying the plain meaning of the statutory definitions used in the first-degree criminal sexual conduct statute, we conclude that Auringer's insertion of his fingers into P.S.'s vagina through her clothing constituted sexual penetration.

## II.

▇ Auringer argues that his rights to due process and a fair trial were denied when the jury heard an audiotape in which a well-credentialed sex crime investigator allegedly commented on the victim's credibility.

▇ Defense counsel did not attempt to suppress or object to admission of the audiotape. He also did not request redaction of any part of the tape or a cautionary jury instruction. Failure to object to the admission of evidence generally constitutes waiver of the right to appeal on that basis. *State v. Bauer*, 598 N.W.2d 352, 363 (Minn. 1999). However, an appellate court may consider a waived issue if there is (1) error; (2) that is plain; and (3) the error affects the defendant's substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998). To satisfy the third prong, a defendant bears a "heavy burden" of persuasion to show that "the error was prejudicial and affected the outcome of the case." *Id.* at 741. If these three prongs are met, the trial court must then decide whether it should address the issue in order to "ensure fairness and the integrity of the judicial proceedings." *Id.* at 740. Only after all these factors are satisfied

may we exercise our discretion to correct an unobjected-to error. *See id.*; *see also Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 1548–49, 137 L.Ed.2d 718 (1997) (describing plain error test, which Minnesota Supreme Court adopted in *Griller*).

▇ It is well settled that one witness may not "vouch for or against the credibility of another witness." *State v. Ferguson*, 581 N.W.2d 824, 835 (Minn. 1998). The credibility of a witness is for the jury to decide. *State v. Koskela*, 536 N.W.2d 625, 630 (Minn.1995). More specifically, we generally "reject expert opinion testimony regarding the truth or falsity of a witness' allegations about a crime, for the expert's status may lend an unwarranted stamp of scientific legitimacy to the allegations." *State v. Myers*, 359 N.W.2d 604, 611 (Minn.1984) (quotation omitted).

Here, the context of the audiotaped interview was made clear to the jury. Auringer appeared voluntarily, and the detective's very clear objective was to elicit Auringer's version of the facts so that the county attorney would have facts from both sides before deciding whether to charge Auringer. In the forty-page transcript, three times Tuma commented that P.S. gave a "convincing story." Each time, the context was the detective's attempt to persuade Auringer to be forthcoming and provide facts to rebut P.S.'s allegations. *Cf. Ferguson*, 581 N.W.2d at 835–36 (stating that because defendant was at police station, jury could have understood officer's statements about credibility of defendant and other witnesses as mere attempt to get defendant to confess). Tuma never said that he was convinced P.S. had given a truthful statement; he referred to P.S. as providing a "story," that, only absent Auringer's side of it, was "convincing." Tuma also provided Auringer with multiple opportunities to show that

P.S. was motivated or prone to lie. Coupled with other testimony that P.S. had previously lied regarding abuse by her father and stepfather, Tuma's comments did not prejudice Auringer or affect the outcome of his trial. Because the comments were not error, and, even if they were, they were not reversible error, Auringer is not entitled to a new trial.

### III.

Auringer has submitted a pro se brief in which he denies the claims made against him and states his version of the facts. Because his brief is, in effect, an attempt to improperly supplement the record with additional facts, this court may disregard it as a violation of Minn. R. Civ.App. P. 110.01, which limits the record on appeal to the evidence presented to the district court.

### D E C I S I O N

Because the definition of sexual penetration unambiguously encompasses penetration through clothing and because the trial court did not err in admitting the audiotaped interview, the postconviction court properly denied Auringer's requested relief.

**Affirmed.**